## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CRYSTAL BUSTER

     Plaintiff,

v.                                    No.

BOARD OF COUNTY COMMISSIONERS FOR
LINCOLN COUNTY, CORRECTIONAL
SOLUTIONS GROUP, LLC, CARLOS MORALES,
individually and in his official capacity, CARLY
REYNOLDS, individually, ANITA HITTLE,
individually, and DOE CHAVEZ, individually,

     Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES
## CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

Plaintiff brings this complaint for damages caused by the violation of her civil and constitutional rights. Plaintiff files this complaint under the federal Civil Rights Act and the Constitution of the United States. Plaintiff also brings claims under state law. In support of this Complaint, Plaintiff alleges the following:

### JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1983 and 1988.

2. This Court also has supplemental jurisdiction over the state law claims alleged pursuant to 28 U.S.C. §1367.

3. The acts complained of occurred exclusively within Lincoln County, New Mexico.

4. Venue is proper in this District as Defendants are residents of New Mexico under 28 U.S.C. § 1391 and all the acts complained of occurred in New Mexico.

## PARTIES

5. Plaintiff, Crystal Buster (hereinafter referred to as "Crystal"), is an individual and current resident of Lincoln County, New Mexico.

6. While incarcerated, Crystal was completely dependent upon the Lincoln County Detention Center (hereinafter "LCDC") for her care and well-being.

7. Defendant Board of County Commissioners for the County of Lincoln (hereinafter referred to as "Defendant Lincoln County") is a political subdivision of the State of New Mexico. Pursuant to § 4-46- 1 NMSA 1978, all suits or proceedings against a county are to be brought in the name of the board of county commissioners of that county.

8. At all material times hereto, Lincoln County was a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, §§ 41-4-3(B) and (C) NMSA 1978, as amended.

9. Defendant Correctional Solutions Group, LLC (hereinafter "Defendant CSG"), is a Texas corporation doing business in New Mexico.

10. At all material times, Defendant CSG was the employer of the individual defendants.

11. At all material times, Defendant CSG was contractually responsible for operating the Lincoln County Detention Center, including the provision of healthcare. This responsibility also included the hiring, retention, training, supervision and discipline of the individually named defendants herein.

12. At all material times hereto, Defendant CSG and its predecessors in interest, their officers, employees, and agents acted under color of law and within the course and scope of their employment and agency.

13. Defendant Carlos Morales (hereinafter "Defendant Morales") was the warden of the

LCDC. Defendant Morales was responsible for the maintenance and operation of the LCDC, including the provision of medical and mental health care for its inmates.

14. Defendant Morales was also responsible for assuring that LCDC's policies and procedures complied with constitutional standards and correctional practices. Defendant Morales' principal duty was to supervise the holding of persons in custody at LCDC.

15. Defendant Morales is sued in his individual and official capacities.

16. Upon information and belief, Defendant Morales is a resident of Lincoln County.

17. At all times material hereto, Defendant Morales acted within the scope of his employment and under color of state law.

18. Defendant "Doe" Chavez (first name as yet unknown) (hereinafter "Defendant Chavez") was employed as a correctional officer at the LCDC.

19. Upon information and belief, Defendant Chavez resides in Lincoln County. Defendant Chavez is sued in his individual capacity only.

20. At all times material hereto, Defendant Chavez acted within the scope of his employment and under color of state law.

21. Defendant Carly Reynolds (hereinafter "Defendant Reynolds") was the Health Services Administrator at the LCDC.

22. Upon information and belief, Defendant Reynolds is a resident in Lincoln County.

23. Defendant Reynolds is sued in her individual capacity only.

24. At all times material hereto, Defendant Reynolds acted within the scope of her employment and under color of state law.

25. Defendant Anita Hittle (hereinafter "Defendant Hittle") was a registered nurse at the LCDC.

26. Upon information and belief, Defendant Hittle is a resident of Lincoln County.

27. Defendant Hittle is sued in her individual capacity only.

28. At all times material hereto, Defendant Hittle acted within the scope of her employment and under color of state law.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

29. At all times material hereto, Lincoln County was a party to written contracts with Defendant Correctional Solutions Group, LLC which authorized Defendant CSG to operate LCDC on behalf of Lincoln County.

30. Despite these written contracts, Defendant Lincoln County had a non-delegable duty to assure that the policies and procedures of LCDC complied with applicable constitutional standards and accepted corrections practices as well as to assure that the constitutional rights of persons detained or confined in LCDC were not violated.

31. Pursuant to §§ 4-44-19, 33-3-3 through 8, and 33-3-13 NMSA 1978, Defendant Lincoln County had a statutory obligation to provide for the confinement of prisoners incarcerated under the county's jurisdiction. Lincoln County had a statutory obligation to appropriate funds and otherwise provide the necessary funding to maintain and operate a facility for the incarceration of prisoners under the jurisdiction of Lincoln County.

32. Plaintiff, Crystal Buster, is the mother of five children.

33. Detention records reflect that Crystal's history of post-traumatic stress disorder ("PTSD"), and bipolar disorder was well documented.

34. In December 2019, Crystal was seeking help for alcohol addiction.

35. On December 24, 2019, Crystal was arrested on suspicion of committing an act of domestic violence.

36. Crystal was booked into LCDC early Christmas morning, December 25, 2019.

37. Before she arrived at the jail, Crystal's left knee was broken by one of the arresting officers with the Ruidoso Police Department ("RPD").

38. Crystal was taken to the emergency room at Lincoln County Medical Center by the RPD where medical staff confirmed a displaced fracture of her left tibial plateau.

39. Crystal was discharged with instructions to elevate her left leg, apply ice, take pain medication, as needed, and to "see orthopedist ASAP."

40. A displaced fracture of the tibial plateau often requires surgery to realign the bone fragments and hold them in position.

41. Without treatment, a displaced fracture of the tibial plateau can result in knee instability, difficulty walking and arthritis.

42. When she was booked into the jail, she was evaluated by Defendant Hittle.

43. Crystal was clearly inebriated when she arrived at the jail.

44. Defendant Hittle noted Crystal's fractured knee and that her pain was a 9 out of 10 on the pain scale.

45. Defendant Hittle also noted Crystal had a history of depression.

46. Crystal reported that she was taking Xanax, a benzodiazepine, which should not be stopped abruptly because it can cause dangerous withdrawal symptoms, such as hallucinations.

47. Defendant Hittle did not make any note of Crystal's obvious alcohol use.

48. In fact, Defendant Hittle indicated Crystal did not have an excessive alcohol habit.

49. Because of her serious injury and mental health history, Crystal was placed in a holding cell for medical observation.

50. Records reflect that Defendant Hittle updated Defendants Morales and Reynolds on Crystal's situation.

51. Holding cells are generally located in the booking area of jails and are designed for short-term placement.

52. Holding cells are not designed for long-term housing of inmates.

53. The cell Crystal was housed in was small with only a metal bunk bed and an inoperable toilet.

54. Crystal was locked in the cell for the vast majority of the day.

55. Crystal's living conditions amounted to solitary confinement.

56. The location of the cell effectively removed Crystal from the general population.

57. In addition, the main lights in the booking area of LCDC, which included the holding cells remained on twenty-four hours per day.

58. The holding cell also had a small light that was controlled by correctional officers.

59. The cell did have a window on the door, but it remained closed the entirety of her stay.

60. The following day, Crystal was seen again by Defendant Hittle.

61. Crystal told Defendant Hittle that she was "real bad" and her pain rated a 9 out of 10 on the pain scale.

62. In response, Defendant Hittle gave Crystal Tylenol but provided no additional care.

63. Records reflect that Defendant Hittle also informed Defendants Morales and Reynolds of Crystal's condition.

64. Later that day, C. Trout LPN went to Crystal's cell and observed her lying on her back crying, shaking, and trembling uncontrollably.

65. Shaking and tremors are classic, obvious symptoms of alcohol and/or benzodiazepine withdrawal.

66. Nurse Trout then elevated Crystal's leg onto some blankets, gave her prescription medications, then left her cell.

67. Nurse Trout provided no additional care.

68. Crystal was still not placed a withdrawal protocol.

69. Crystal had still not been seen by a mental health clinician.

70. Crystal continued to be in extreme pain related to her knee fracture and was observed crying and moaning in her cell.

71. Crystal's pain eventually became so intense she required emergency hospital care.

72. On December 26, 2019, Crystal was transferred to Lincoln County Medical Center.

73. She was evaluated and prescribed pain medication to manage her severe pain.

74. When Crystal returned to LCDC she was placed back into the holding cell for medical observation.

75. Crystal was unable to walk without assistance because of her serious knee injury.

76. As a result, Crystal was unable to use the restroom or shower without assistance.

77. Defendants refused to assist Crystal to the restroom, so she was forced to either urinate on herself or hobble to the toilet on her broken knee in excruciating pain.

78. On December 29, 2019, Crystal fell trying to get herself to the toilet in her cell.

79. V. Gomez, LPN, arrived at Crystal's cell to evaluate her after the fall.

80. Nurse Gomez noted Crystal was extremely anxious.

81. In response, Nurse Gomez helped Crystal to her wheelchair and told her to remain on her bunk or seated in her wheelchair.

82. Nurse Gomez observed Crystal in deplorable conditions.

83. Nurse Gomez also noted Crystal had been exhibiting bizarre behavior all day.

84. Throughout the day, Crystal had been talking to herself, whispering noncoherently, and telling LCDC staff she did not belong there.

85. Nurse Gomez was unable to do a full assessment due to Crystal's behavior.

86. It was obvious Crystal was experiencing a mental health crisis and required immediate medical intervention.

87. Instead of arranging immediate emergency mental health care, Nurse Gomez left Crystal untreated in her solitary confinement cell.

88. Crystal was not provided with any care or a referral to obtain the intervention she needed.

89. Crystal continued to exhibit bizarre behaviors throughout the night and the following morning.

90. Detention staff conducted visual checks and ignored Crystal's behavior and obvious need for medical help.

91. On December 30, 2019, Defendant Hittle went to Crystal's cell to give her medications.

92. Defendant Hittle noted Crystal's behavior was unchanged and she continued to "ramble on verbally, not making sense."

93. Defendant Hittle also noted Crystal did not know where she was.

94. Defendant Hittle left Crystal on the floor "for safety."

95. Defendant Hittle contacted the facility's psychiatric provider, Ms. Edwards, CNP.

96. Ms. Edwards told Defendant Hittle that Crystal was exhibiting obvious signs of alcohol withdrawal.

97. Despite the obvious signs of alcohol withdrawal, no protocol had been put in place.

98. Ms. Edwards told Defendant Hittle that Crystal needed to be sent to the emergency room based on the severity of her withdrawal.

99. Records indicate that Defendant Hittle apprised Defendant Reynolds of Crystal's condition.

100. Crystal had been suffering from obvious signs of alcohol and Xanax withdrawal without any medical intervention for five days.

101. Crystal was eventually taken to the emergency room at Lincoln County Medical Center, where she was treated and prescribed medication to help treat the symptoms of her withdrawal.

102. When Crystal returned to LCDC she was placed back in the holding cell in isolation.

103. On January 1, 2020, Crystal continued to experience extreme pain.

104. She was eventually taken to the medical department in a wheelchair and was evaluated by Defendant Hittle.

105. Defendant Hittle noted Crystal had been unable to stand and her range of motion was greatly decreased.

106. She also noted Crystal was in acute, severe distress.

107. In response, Defendant Hittle had Crystal sent back to her cell and told her to continue icing and elevating her knee.

108. Although Crystal was on medical observation, LCDC staff failed to perform adequate checks in accordance with the jail's policies and procedures.

109. Staff frequently failed to conduct any checks for twelve to twenty-four hours at a time.

110. Crystal was forced to struggle from her bunk to her toilet without assistance on her broken knee.

111. LCDC staff also failed to offer Crystal opportunities for recreation or for showers.

112. As a result, Crystal was unable to bathe for nearly a month after she arrived at the jail.

113. During this time, Crystal was menstruating.

114. Because she was unable to use the restroom on her own and was not allowed showers, Crystal was forced to sit in her own menstrual blood for extraordinary lengths of time.

115. For portions of her detention, the toilet in Crystal's cell was not working and would not flush.

116. If Crystal was able to move herself to the toilet, she would be forced to sit in her cell with the urine and feces sitting in the toilet.

117. On January 8, 2020, Crystal returned to the Lincoln County Medical Center for an orthopedic appointment with Dr. Vu.

118. Dr. Vu evaluated Crystal and noted she was in constant, localized, sharp pain in her knee.

119. At the time of her evaluation, he rated her pain at a 6 of 10 on the pain scale.

120. After the evaluation, Dr. Vu explained to Crystal there was indication for surgery on her knee and asked that she return for a follow up appointment in two weeks.

121. LCDC staff did not schedule a follow up appointment or take her back to the hospital for follow up care on her knee as ordered by Dr. Vu.

122. In addition to her physical injuries, Crystal's mental health continued to suffer from no treatment.

123. She was finally seen by a psychiatric provider on January 18, 2020.

124. During this appointment she appeared unkempt, tearful, and anxious.

125. After evaluating Crystal, Ms. Edwards increased her medications but planned no additional treatment or follow-up care.

126. Crystal was then returned to her solitary cell.

127. Crystal received no additional medical or mental health care for more than a month.

128. On February 19, 2020, Crystal was seen by the facility's doctor for the first time.

129. This doctor saw Crystal in the medical department but provided no actual care.

130. During the doctor's evaluation, they noted Crystal had a fractured knee and advised her to continue using crutches and a wheelchair as needed for support.

131. Crystal was then returned to her cell.

132. For the remainder of her time at the jail, Crystal did not receive any additional medical or mental health care, aside from medications.

133. Crystal remained in isolation without access to recreation, showers, phones, or other social interaction.

134. Throughout her time in isolation, she was taunted and mocked by LCDC staff.

135. Crystal would tell the guards that she was scared and missed her children.

136. At night, guards would deliberately turn off the small light in Crystal's cell thereby plunging her into absolute darkness, then bang on her door to scare her.

137. Crystal would cry out "Let me out. I want to go home."

138. Defendant Chavez was particularly cruel to her and frequently taunted her.

139. Defendant Chavez would bang on her door and mock Crystal by saying "Let me out. I want to go home" and "Help, help. I want to go home."

140. Guards who offered kindness or compassion were mocked by other detention staff.

141. This behavior discouraged any staff to show Crystal anything other than disdain.

142. On February 24, 2020, Crystal was finally able to post bond and was released from LCDC.

143. Crystal suffered injuries from her time in LCDC, including pain and suffering, anxiety, post-traumatic stress disorder, and exacerbation of her mental illness as a result of her confinement.

### COUNT I: VIOLATION OF PROCEDURAL DUE PROCESS
### (Defendant Morales in his Individual and Official Capacity)

144. Plaintiff restates each of the preceding allegations as if fully stated herein.

145. Crystal was placed into solitary confinement and remained in isolation for the entirety of her detention.

146. Crystal was not afforded a hearing before being placed in solitary confinement.

147. While in solitary confinement, Crystal did not have access to the basic programming and services received by other inmates in the facility.

148. While in solitary confinement, Crystal's access to telephone calls, mail, visitation, recreation, group therapy sessions and commissary were restricted as compared to the general population.

149. Crystal was only allowed ten (10) showers over the duration of her two-month detention at LCDC.

150. Crystal would often go more than one week without being allowed a shower.

151. Crystal's conditions of confinement were atypical.

152. While in solitary confinement, Crystal's mental health deteriorated significantly.

153. The conditions of confinement that Crystal was subjected to were so degrading, dehumanizing, and torturous that they amounted to de facto punishment of a pretrial detainee.

154. As such, Crystal received no due process for this punishment.

155. Defendant Morales knew his conditions were punishing and provided no due process,

notwithstanding those conditions.

156. As such Defendant Morales acted with deliberate indifference to Crystal's Constitutional rights.

157. In placing Crystal in solitary confinement for such a lengthy period without affording her a hearing, or a periodic classification review, Defendant Morales denied Crystal procedural due process of law as guaranteed by the Fourteenth Amendment.

### COUNT II:  VIOLATION OF FOURTEENTH AMENDMENT: INHUMANE CONDITIONS OF CONFINEMENT/ INADEQUATE MEDICAL CARE (Defendants Morales, Reynolds, Hittle and Chavez)

158. Plaintiff restates each of the preceding allegations as if fully stated herein.

159. The constitutional rights of a pretrial detainee are derived from the due process clause of the Fourteenth Amendment and are distinguishable from an inmate's right not to be subjected to cruel and unusual punishment under the Eighth Amendment.

160. As a pre-trial detainee, Crystal had a substantive due process right under the Fourteenth Amendment to humane conditions of confinement and adequate medical care.

161. The Fourteenth Amendment prohibited Defendants from punishing Crystal.

162. Crystal's solitary cell was a holding cell that was not designed for the long-term housing of an inmate.

163. Crystal's cell had an inoperable toilet which did not flush, resulting in urine and feces collecting in the toilet bowl for hours, if not days, at times.

164. Crystal's conditions of confinement were atypical and violated contemporary standards of decency.

165. It is commonly known in the field of corrections and detention facilities, that solitary confinement is particularly toxic to those suffering from severe mental health problems.

166. The standard of care in detention facilities, is to avoid using solitary confinement, if possible, on those inmates diagnosed with bi-polar disorder.

167. The standard of care also requires any inmate with bi-polar disorder to be closely monitored by a mental health professional if housed in conditions akin to solitary confinement.

168. On arrival in LCDC, Crystal disclosed that she required medications for her bipolar disorder and PTSD.

169. As the Warden, Defendant Morales was personally responsible for the decision to house Crystal in isolation.

170. Defendants Morales and Reynolds claimed to house Crystal in solitary confinement for "medical observation."

171. Defendants Morales and Reynolds knew this required Crystal to be closely monitored.

172. Medical observation requires consistent monitoring of Crystal's medical and mental health conditions.

173. Instead, Defendants Morales and Reynolds failed to ensure that regular checks were conducted and allowed Crystal to remain unmonitored for extraordinarily long periods of time.

174. While in solitary, Crystal did not leave her cell for extended periods of time.

175. While in solitary, Crystal did not see natural light for extended periods of time.

176. While in solitary, Defendant Morales failed to provide constitutionally mandated recreation time each day, such that she did not go outside, or leave her cell for lengthy periods of time.

177. Defendants Morales, Reynolds and Hittle also knew Crystal was unable to walk on her own as a result of her broken knee.

178. Plaintiff could not use the restroom or shower without assistance.

179. Defendants Morales, Reynolds and Hittle failed to take care of Crystal's hygiene needs even though she had a serious and obvious medical condition that prevented her from taking care of herself.

180. Defendants Morales, Reynolds and Hittle failed to provide the physical assistance Plaintiff required.

181. As a result, Crystal was subjected to long periods of time without the opportunity to use the restroom or shower, or was forced to do so without assistance, resulting in further injury.

182. Plaintiff was forced to sit on her bed in her own urine and menstrual blood for extraordinary lengths of time.

183. Defendants Morales, Reynolds and Hittle were aware that the conditions of Crystal's cell were inhumane.

184. During her time at LCDC, Crystal also suffered from alcohol withdrawal.

185. It was obvious that Crystal was suffering from withdrawal soon after she entered the jail.

186. Defendants Morales, Reynolds and Hittle knew alcohol and Xanax withdrawal are extremely common and predictable events in a jail setting.

187. Defendants Morales, Reynolds and Hittle knew alcohol and/or Xanax withdrawal is a dangerous and life-threatening medical condition.

188. Because of its severity, individuals experiencing alcohol and/or Xanax withdrawal need constant monitoring of their symptoms, water and food intake, and vitals.

189. Defendants Morales, Reynolds and Hittle failed to adequately monitor Crystal while she experienced withdrawal.

190. Eventually, Crystal's symptoms became so severe that she began hallucinating.

191. When Crystal began experiencing hallucinations, she should have been promptly transferred to a hospital setting.

192. Instead, Defendants Morales, Reynolds and Hittle left Crystal in a solitary cell and allowed her to continue suffering untreated from severe withdrawal.

193. Defendants Morales, Reynolds and Hittle knew that alcohol and/or Xanax withdrawal is likely to lead to death if left untreated and unmonitored.

194. Despite this knowledge, Defendants Morales, Reynolds and Hittle failed to monitor or treat her obvious symptoms of withdrawal for nearly one week after she was booked into the jail.

195. Defendant Morales, as the warden of LCDC, had a duty to know who was being housed in solitary confinement.

196. Defendant Morales had a duty to ensure inmates housed in solitary confinement were housed in humane conditions.

197. Defendant Hittle kept Defendants Morales and Reynolds updated of Crystal's status and condition while in solitary confinement.

198. Defendant Morales allowed Crystal to remain in solitary confinement for the duration of her detention.

199. Shortly before Plaintiff's detention the New Mexico legislature passed the Restrictive Housing Act (RHA).

200. The RHA prohibited the use of solitary confinement for any inmate longer than fifteen (15) days.

201. The passage of the RHA also required detention centers phase out their use of solitary confinement of the mentally ill by July 1, 2020.

202. Despite this law, Defendants Morales and Reynolds housed Crystal in solitary confinement for a total of sixty-one (61) consecutive days.

203. Defendants Morales, Reynolds and Hittle were aware of the mental health effects of prolonged solitary confinement.

204. Defendants Morales, Reynolds and Hittle knew Crystal's mental condition had deteriorated dramatically since being booked into segregation at LCDC.

205. Despite this knowledge, Defendants Morales and Reynolds allowed Crystal to remain segregated for the duration of her detention.

206. Defendant Chavez knew that Crystal was scared and extremely worried about her children.

207. Throughout her detention in solitary, Defendant Chavez would taunt and mock Crystal at her cell door.

208. Defendant Chavez would bang on Crystal's cell door and mock her by yelling "Help, help. I want to go home" and "Let me out."

209. Defendant Chavez would deliberately incite Crystal by baiting and taunting her.

210. Defendant Chavez discouraged and even prevented other guards from providing Crystal with humane conditions.

211. Defendant Chavez intentionally made Crystal's conditions unbearable and actively harassed her throughout her detention.

212. Defendants Morales, Chavez, Hittle, and Reynolds knew Plaintiff faced a substantial risk of serious mental or physical harm if her conditions of confinement did not meet contemporary standards of decency.

17

213. All Defendants acted with deliberate indifference to this risk.

214. Crystal's conditions of confinement, as described above, amounted to de facto punishment of a pre-trial detainee in violation of the Fourteenth Amendment to the United States Constitution.

215. As a proximate and foreseeable result of Defendants' deliberate indifference, Crystal suffered injuries including pain and suffering, emotional distress, post-traumatic stress disorder and exacerbation of her mental illness as a result of her confinement.

### COUNT III: NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Correctional Solutions Group, LLC, Reynolds, and Hittle)

216. Plaintiff states each of the preceding allegations as if fully stated herein.

217. Defendant CSG was contracted by Lincoln County to provide medical and mental health care to inmates housed at LCDC at all material times.

218. Defendant Reynolds was employed by Defendant CSG as the health services administrator at LCDC.

219. Defendants CSG and Reynolds had a duty to provide all inmates at LCDC, including Plaintiff, adequate medical and mental health care.

220. Defendant Reynolds was aware of Crystal's severe medical and mental health conditions.

221. Defendant Reynolds had an obligation to ensure her staff were providing necessary and appropriate care under the circumstances.

222. Defendant Hittle frequently ignored serious signs and symptoms of Crystal's deteriorating condition.

223. As a result, Crystal's health continued to deteriorate and never improved.

224. Defendants knew Crystal required follow up care and surgical intervention for her broken knee.

225. Defendants refused to allow Crystal the necessary care.

226. Crystal was forced to wait until she was finally released to obtain this necessary care.

227. Defendants also knew Crystal was in need of mental health care and treatment for alcohol and Xanax withdrawal.

228. Defendants observed and were told that Crystal was exhibiting bizarre behavior, hallucinations, shakes, and tremors, but refused to obtain the care or referrals Crystal needed.

229. As a result, Crystal's condition worsened.

230. Defendants CSG, Reynolds, and Hittle failed to act reasonably under the circumstances and failed to provide the medical and mental health care Plaintiff desperately needed.

231. In doing so, Defendants CSG, Reynolds, and Hittle breached their duty to Crystal.

232. As a result of Defendants' negligence, Plaintiff suffered serious injuries, including pain and suffering, emotional distress, post-traumatic stress disorder and exacerbation of her mental illness.

### COUNT IV: VIOLATION OF FOURTEENTH AMENDMENT: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
### Defendant Lincoln County and Defendant Morales in his Official Capacity/ Defendant Lincoln County

233. Plaintiff states each of the preceding allegations as if fully stated herein.

234. Defendant, the Board of County Commissioners for Lincoln County delegated the responsibilities of running LCDC to Defendant Morales.

235. Pursuant to state law, jail administrators acting in their official capacity are regarded as the final policy makers of their respective institutions.

236. Defendant Morales was therefore the final policymaker responsible for operating LCDC.

237. Defendant Morales was responsible for setting and enforcing the policies of the LCDC.

238. Defendant Morales personally allowed Crystal to be incarcerated in inhumane conditions of confinement.

239. Defendant Morales personally knew that Crystal was suffering in a solitary confinement cell without procedural due process.

240. Defendant Morales personally knew that Crystal's mental health deteriorated while in isolation at LCDC.

241. As the Warden, Defendant Morales' actions amounted to official County customs and policies.

242. There is a causal connection between Defendants' policies and the violation of Plaintiff's constitutional rights, which amounts to deliberate indifference.

243. As a proximate and foreseeable result of Defendants' deliberate indifference to Crystal's serious, obvious medical condition, Crystal suffered serious injuries, including pain and suffering, emotional distress, post-traumatic stress disorder and exacerbation of her mental illness.

## JURY DEMAND

244. Plaintiff hereby demands a trial by jury on all counts so triable.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

20

Respectfully submitted,

COYTE LAW P.C.

 /s/ Matthew E. Coyte
Matthew E. Coyte
*Attorney for Plaintiff*
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
mcoyte@me.com


LAW OFFICE OF MATTHEW VANCE, P.C.

/s/ Lisa Y. Schatz-Vance
Lisa Y. Schatz-Vance
Matthew Vance
*Attorneys for Plaintiff*
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 242-6267
lisa@mattvancelaw.com
mattvance@mattvancelaw.com